No. 2023-2100

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

JOHNATHAN H. DINH, DWIGHT D. JERECZEK, SANDY CHUAN-DINH,
DEBORAH JERECZEK, STAN ELLIOTT, RYAN TRAN, THANH NGA TRAN,
WALTER NAHM, LAUREN NAHM, PAMELA PAYSON,
individually and on behalf of all others similarly situated,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

**DEFENDANT-APPELLEE'S BRIEF**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464
*Attorneys for Defendant-Appellee*

December 20, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATEMENT OF THE ISSUES...........................................................................5

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS.............6

I.    Congress Enacts PROMESA.........................................................................6

II.   COFINA And The District Court Litigation ..................................................8

III.  Plaintiffs' Complaint ...................................................................................11

IV.   The Trial Court's Decision ..........................................................................14

SUMMARY OF THE ARGUMENT ...................................................................18

ARGUMENT .....................................................................................................19

I.    Standards Of Review ...................................................................................19

II.   Pursuant To 48 U.S.C. § 2126(a), The Trial Court Does Not Possess
      Jurisdiction To Entertain Plaintiffs' Complaint ...........................................20

III.  The Alleged Government Actions At Issue Cannot Give Rise To
      Takings Liability..........................................................................................30

      A.    Takings Liability For The Actions Of Third Parties...........................31

B.    Plaintiffs Cannot Directly Base Their Takings Claims On The Actions Of
      The Oversight Board And The District Court ...............................................32

C.    Plaintiffs Cannot Establish That Any Effects Of PROMESA On COFINA
      Bonds Were Direct And Intended, Or That The Government Is Liable For
      The Discretionary Decisions Of The Oversight Board .................................34

D.    The Cases Plaintiffs Rely On To Establish Takings Liability Are
      Inapposite....................................................................................................39

IV.     PROMESA Did Not Take Plaintiffs' Contract Rights ....................................42

V.      No *Per Se* Takings Test Applies To Plaintiffs' Claim ..................................45

VI.     Plaintiffs Fail To State a Cognizable Takings Claim Under *Penn Central* ..49

        A.      Plaintiffs Have Not Plausibly Pleaded Sufficient Economic Impact..50

        B.      PROMESA Has Not Plausibly Interfered With Plaintiffs' Reasonable
                Investment-Backed Expectations .........................................................53

        C.      The Character Of The Government Action Supports That No Taking
                Occurred ...............................................................................................59

VII.    The Trial Court Did Not Abuse Its Discretion In Denying Plaintiffs Leave
        to Amend Their Complaint..............................................................................60

CONCLUSION ......................................................................................................61

# TABLE OF AUTHORITIES

**Cases**

*A & D Auto Sales, Inc. v. United States*,
  748 F.3d 1142 (Fed. Cir. 2014) .................................................................. *passim*

*Acceptance Ins. Cos. Inc. v. United States*,
  503 F.3d 1328 (Fed. Cir. 2007) ............................................................. 14, 21, 26

*Air Pegasus of D.C., Inc. v. United States*,
  424 F.3d 1206 (Fed. Cir. 2005) ....................................................................46

*Allustiarte v. United States*,
  256 F.3d 1349 (Fed. Cir. 2001) ....................................................................34

*Alpine PCS, Inc. v. United States*,
  878 F.3d 1086 (Fed. Cir. 2018) ............................................................... 21, 30

*Altair Global Credit Opportunities Fund (A), LLC v. United States*,
  138 Fed. Cl. 742 (2018) ...............................................................................26

*Altair Global Credit Opportunities Fund (A), LLC v. United States*,
  151 Fed. Cl. 276 (2020) ................................................................... *passim*

*Alves v. United States*,
  133 F.3d 1454 (Fed. Cir. 1998) ....................................................................31

*Appolo Fuels, Inc. v. United States*,
  381 F.3d 1338 (Fed. Cir. 2004) ....................................................................54

*Armstrong v. United States*,
  364 U.S. 40 (1960) ......................................................................................48

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................60

*B & G Enters., Ltd. v. United States*,
  220 F.3d 1318 (Fed. Cir. 2000) ....................................................................31

*Babbitt* v. *Youpee*,
  519 U.S. 234 (1997) ....................................................................................30

*Banks v. United States*,
  741 F.3d 1268 (Fed. Cir. 2014) ....................................................................19

iii

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ................................................................22

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................... 20, 35

*Biltmore Forest Broad. FM, Inc. v. United States*,
  555 F.3d 1375 (Fed. Cir. 2009) ...........................................19

*Branch v. United States*,
  69 F.3d 1571 (Fed. Cir. 1995) ..............................................56

*Brown v. Legal Foundation of Washington*,
  538 U.S. 216 (2003) ..............................................................49

*Capela Sales & Servs. Ltd. v. United States, Aluminum Extrusions Fair Trade Comm.*,
  878 F.3d 1329 (Fed. Cir. 2018) ............................................26

*CCA Assocs. v. United States*,
  667 F.3d 1239 (Fed. Cir. 2011) ............................................51

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) ............................................... 40, 41, 46

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003) ......................... 44, 45, 48, 52

*Cienega Gardens v. United States*,
  503 F.3d 1266 (Fed. Cir. 2007) ............................................56

*Commonwealth Edison Co. v. United States*,
  271 F.3d 1327 (Fed. Cir. 2001) ................................... 54, 57

*Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*,
  508 U.S. 602 (1993) ................................... 46, 47, 53, 55

*Connolly v. Pension Ben. Guar. Corp.*,
  475 U.S. 211 (1986) .................................................. 46-48, 54

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
  18 F.3d 1581 (Fed. Cir. 1994) ..............................................23

*Cultor Corp. v. A.E. Staley Mfg. Co.*,
  224 F.3d 1328 (Fed. Cir. 2000) ............................................60

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................51

*Eastern Enters. v. Apfel*,
    524 U.S. 498 (1998) ................................................... *passim*

*Elliott v. Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    142 S. Ct. 74 (2021) ....................................... 9-11, 25

*Estate of Cowart v. Nicklos Drilling Co.*,
    505 U.S. 469 (1992) ................................................................22

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
    140 S. Ct. 1649 (2020) ................................................ *passim*

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*,
    598 U.S. 339 (2023) ...................................... 2, 6, 59

*Folden v. United States*,
    379 F.3d 1344 (Fed. Cir. 2004) .........................................19

*Foman v. Davis*,
    371 U.S. 178 (1962) ................................................................60

*Forest Props., Inc. v. United States*,
    177 F.3d. 1360 (Fed. Cir. 1999) ........................................50

*Hendler v. United States*,
    952 F.2d 1364 (Fed. Cir. 1991) .........................................40

*Hertel Ave. Assocs., LLC v. Calloway*,
    761 F.3d 252 (2d Cir. 2014) ..............................................48

*Hopi Tribe v. United States*,
    55 Fed. Cl. 81 (2002) ............................................................23

*Horne v. Dep't of Agric.*,
    569 U.S. 513 (2013) ...................................... 21, 30

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) ................................................................22

*Huntleigh USA Corp. v. United States*,
    525 F.3d 1370 (Fed. Cir. 2008) .........................................43

v

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  41 F.4th 29 (1st Cir. 2022)...................................................................38

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  361 F. Supp. 3d 203 (D.P.R. 2019) ............................... 10, 11, 34, 53

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*,
  987 F.3d 173 (1st Cir. 2021)............................................... *passim*

*In re Weinstein*,
  164 F.3d 677 (1st Cir. 1999)...............................................................48

*Joshua v. United States*,
  17 F.3d 378 (Fed. Cir. 1994) .............................................................34

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979).............................................................................40

*Kemin Foods, L.C. v.Centro S.A. de C.V.*,
  464 F.3d 1339 (Fed. Cir. 2006) .........................................................60

*Kingdomware Techs., Inc. v. United States*,
  136 S. Ct. 1969 (2016)........................................................................22

*Lexecon Inc. v. Milberg Weiss Berhad Hynes & Lerach*,
  523 U.S. 26 (1998)...............................................................................23

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005).............................................................................51

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)..................................................................... 40, 41

*Louisville Joint Stock Bank v. Radford*,
  295 U.S. 555 (1935).............................................................................41

*Love Terminal Partners, L.P. v. United States*,
  889 F.3d 1331 (Fed. Cir. 2018) .................................................. 50, 52

*Lynch v. United States*,
  292 U.S. 571 (1934).............................................................................43

*Marcum LLP v. United States*,
  753 F.3d 1380 (Fed. Cir. 2014) .........................................................20

*Moholt v. Dean Witter Reynolds, Inc.*,
  478 F. Supp. 451 (D. D.C. 1979) ..........................................................54

*New York Cent. R.R. v. White*,
  243 U.S. 188 (1917)..........................................................................57

*Nollan v. California Coastal Comm'n*,
  483 U.S. 825 (1987)..........................................................................40

*Norman v. United States*,
  429 F.3d 1081 (Fed. Cir. 2005) ......................................................53

*Omnia Commercial Co., Inc. v. United States*,
  261 U.S. 502 (1923).............................................................. 43, 44, 45

*Palmyra Pacific Seafoods, L.L.C. v. United States*,
  561 F.3d 1361 (Fed. Cir. 2009) ....................................................43, 44

*Penn Central Transportation Co. v. City of New York*,
  438 U.S. 104 (1978) .................................................................. *passim*

*Petro-Hunt, L.L.C. v. United States*,
  862 F.3d 1370 (Fed. Cir. 2017) ......................................................34

*Piszel v. United States*,
  833 F.3d 1366 (Fed. Cir. 2016) ....................................................45, 46

*Preseault v. United States*,
  494 U.S. 1 (1990)................................................................ 21, 28, 41

*Puerto Rico v. Franklin California Tax-Free Tr.*,
  579 U.S. 115 (2016).......................................................................56-57

*Ravin v. Wilkie*,
  956 F.3d 1346 (Fed. Cir. 2020) ......................................................22

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984).................................................................. *passim*

*Sandifer v. U.S. Steel Corp.*,
  571 U.S. 220 (2014)..........................................................................22

*Shearin v. United States*,
  992 F.2d 1195 (Fed. Cir. 1993) ......................................................19

*Shinnecock Indian Nation v. United States,*
   782 F.3d 1345 (Fed. Cir. 2015) ............................34

*Tahoe-Sierra Council, Inc. v. Tahoe Reg'l Plan. Agency,*
   535 U.S. 302 (2002) ............................40

*Taylor v. United States,*
   959 F.3d 1081 (Fed. Cir. 2020) ............................ *passim*

*Tex. State Bank v. United States,*
   423 F.3d 1370 (Fed. Cir. 2005) ............................32

*United States v. Causby,*
   328 U.S. 256 (1946) ............................21

*United States v. Culbert,*
   435 U.S. 371 (1978) ............................25

*United States v. Gonzales,*
   520 U.S. 1 (1997) ............................24

*United States v. Testan,*
   424 U.S. 392 (1976) ............................20

*Webb's Fabulous Pharmacies v. Beckwith,*
   449 U.S. 155 (1980) ............................41

*Weinberger v. Salfi,*
   422 U.S. 749 (1975) ............................27

*Welty v. United States,*
   926 F.3d 1319 (Fed. Cir. 2019) ............................31

**Statutes**

7 U.S.C. § 1506(d) ............................26

11 U.S.C. § 101(5) ............................37

11 U.S.C. § 101(52) ............................56

28 U.S.C. § 1491(a)(1) ............................21

48 U.S.C. § 2101 ............................1

48 U.S.C. § 2104(3) ................................................................37

48 U.S.C. § 2104(7) ..................................................................8

48 U.S.C. § 2121(c) ...............................................................2, 7

48 U.S.C. § 2121(d) ..............................................................8, 39

48 U.S.C. § 2126(a) ...........................................................*passim*

48 U.S.C. § 2150(c) ................................................................29

48 U.S.C. § 2161(a) ...........................................................36, 57

48 U.S.C. § 2168(a) ..................................................................8

48 U.S.C. § 2174 ......................................................................8

48 U.S.C. § 2194 ......................................................................8

48 U.S.C. § 2194(d)(2) .............................................................8

48 U.S.C. § 2194(m) ............................................................6, 24

Pub. L. No. 96-364 ................................................................47

Pub. L. No. 114-187 ..................................................................1

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of this Court's Rules, counsel for defendant-appellee states that he is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.  Counsel is also unaware of any other cases currently pending before this Court that may be affected by the Court's decision in this case.

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | |
|---|---|
| JOHNATHAN H. DINH, DWIGHT D. ) | |
| JERECZEK, SANDY CHUAN-DINH, ) | |
| DEBORAH JERECZEK, STAN ELLIOTT, ) | |
| RYAN TRAN, THANH NGA TRAN, ) | |
| WALTER NAHM, LAUREN NAHM, ) | |
| PAMELA PAYSON, individually and on ) | |
| behalf of all others similarly situated, ) | |
| ) | |
| ) | |
| Plaintiffs-Appellants, ) | |
| ) | |
| v. ) | No. 2023-2100 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| ) | |
| Defendant-Appellee. ) | |
| ) | |

## <u>DEFENDANT-APPELLEE'S BRIEF</u>

Defendant-appellee, the United States, respectfully submits this response

brief in the appeal filed by plaintiffs-appellants Johnathan H. Dinh, Dwight D.

Jereczek, Sandy Chuan-Dinh, Deborah Jereczek, Stan Elliott, Ryan Tran, Walter

Nahm, Lauren Nahm and Pamela Payson (collectively, plaintiffs).

## <u>INTRODUCTION</u>

In 2016, Congress enacted the Puerto Rico Oversight, Management, and

Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (codified at 48 U.S.C.

§ 2101 *et. seq.*) (PROMESA), which established a comprehensive statutory scheme

to return the Commonwealth of Puerto Rico to economic stability.  At the time
Congress enacted PROMESA, the Commonwealth, a United States territory, faced
a "fiscal emergency" under which its "public debt had soared" to "more than the
annual output" of its economy.  *Fin. Oversight & Mgmt Bd. for Puerto Rico v.
Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023).

Pursuant to Title I of PROMESA, Congress created the Financial Oversight
and Management Board within the government of Puerto Rico (the Oversight
Board) to guide Puerto Rico in its economic recovery.  In doing so, Congress
specifically provided that the Oversight Board "shall not be considered to be a
department, agency, establishment, or instrumentality of the Federal Government."
48 U.S.C. § 2121(c)(2).  The United States Supreme Court subsequently held that
the Oversight Board is an entity of the Commonwealth and not the United States.
*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649,
1661 (2020).  Title III of the statute established a legal framework that
incorporated many provisions of Chapter 9 of the Bankruptcy Code concerning
municipal bankruptcies, to allow the Commonwealth and its instrumentalities to
participate in a legal process to restructure their debts.  In addition, so that all
actions relating to PROMESA would be heard in the same forum, PROMESA
required that "any action" against the Oversight Board or "arising out of"

PROMESA, "in whole or in part," be brought in the United States District Court for the District of Puerto Rico, 48 U.S.C. § 2126(a).

Following PROMESA's enactment, the Oversight Board exercised its discretion and filed petitions under Title III in district court on behalf of the Commonwealth and five of its instrumentalities including, as relevant here, the Puerto Rico Sales Tax Financing Corporation (COFINA, an acronym for the Spanish name of the corporation), a public corporation established by the Commonwealth to issue bonds arising out of a percentage of the Commonwealth's sales and use tax (SUT) revenues.

The Title III district court proceedings for COFINA and the Commonwealth eventually resolved a significant issue—whether the Commonwealth or COFINA held superior rights in the SUT revenues that the Commonwealth pledged to COFINA. In the district court, the parties reached a negotiated settlement that divided the disputed SUT revenues, with 53.65% allocated to COFINA, and the remainder to the Commonwealth. Senior and junior COFINA bondholders also overwhelmingly voted in support of a COFINA-Commonwealth agreement under which junior COFINA bondholders such as plaintiffs received approximately fifty-five cents on the dollar in new COFINA bonds relative to the par value of their original bonds. With these agreements in place, the district court approved the COFINA plan of adjustment in February 2019, overruling all objections to the plan

including objections from certain junior bondholders that the plan of adjustment violated the Fifth Amendment's Takings Clause. In February 2021, the United States Court of Appeals for the First Circuit affirmed confirmation of the plan, and the Supreme Court subsequently denied a petition for a writ of certiorari.

Plaintiffs are ten individuals who allege that they owned junior COFINA bonds with rights to be paid principal and interest, and which were secured by the SUT revenues in accordance with the terms of the Sales Tax Revenue Bond Resolution (Bond Resolution). According to plaintiffs, the Bond Resolution constituted a contract among COFINA, COFINA bondholders, and a bank operating as the trustee. In their complaint, plaintiffs do not directly attack the decisions of the Oversight Board (Puerto Rico) or the district court. Instead, they contend that Congress effected a taking of their property by enacting PROMESA itself. Plaintiffs allege that operating pursuant to the statute, the Commonwealth, the Oversight Board, and the district court took steps that prevented plaintiffs from pursuing a contractual or judicial remedy to address COFINA's default on the bonds and took steps that resulted in the restructuring of the COFINA debt they held. Plaintiffs allege that these actions curtailed their bond rights, security for repayment, and the value of their investment.

This Court should affirm the decision of the Court of Federal Claims (trial court) dismissing plaintiffs' complaint. As a threshold matter, the trial court

lacked jurisdiction over plaintiffs' complaint because Congress explicitly directed that all cases arising under PROMESA, "in whole or in part," must be pursued in the District of Puerto Rico. When Congress established its exclusive scheme under section 2126(a), it denied the trial court jurisdiction over any action arising out of PROMESA, including plaintiffs' suit.

In addition, the trial court correctly held that plaintiffs failed to identify sufficient Government action to support a takings claim based on only PROMESA's enactment. In enacting PROMESA, Congress simply established a general framework for the restructuring of territorial debt, and plaintiffs' alleged taking of property is necessarily predicated on a myriad of discretionary actions of a non-Federal entity—the Oversight Board—which cannot be attributed to the Federal Government for takings purposes. Moreover, if the Court were to apply a takings test, it would be the factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), and plaintiffs cannot demonstrate a right to relief under any of the three factors. Finally, the trial court did not abuse its discretion in denying plaintiffs' boilerplate request to amend their complaint given that any amendment would be futile.

## STATEMENT OF THE ISSUES

1.    Whether the trial court possessed jurisdiction to entertain plaintiffs' takings claims where, pursuant to 48 U.S.C. § 2126(a), Congress explicitly

directed that all cases arising out of PROMESA, "in whole or in part," shall be brought in district court.

2.     Alternatively, whether the trial court correctly dismissed plaintiffs' complaint for failure to state a claim because Congress's enactment of PROMESA does not constitute sufficient Government action to support their takings claims.

3.     Whether plaintiffs fail to state a claim for a regulatory taking under the Supreme Court's *Penn Central* test.

4.     Whether the trial court abused its discretion in denying plaintiffs' request to amend their complaint.

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

## I.    Congress Enacts PROMESA

On June 30, 2016, Congress enacted PROMESA to address a dire economic crisis facing Puerto Rico. *See Centro de Periodismo*, 598 U.S. at 342. In enacting the statute, Congress cited the extreme economic conditions that prompted the law's passage, including "[a] combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing." 48 U.S.C. § 2194(m).

To address the crisis, Congress instituted an extensive, comprehensive framework. In Title I of PROMESA, pursuant to its plenary powers over United States territories in Article IV of the Constitution, Congress created the Oversight

Board as an "entity within the territorial government" of the Commonwealth, and provided that it "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(c); *see Aurelius*, 140 S. Ct. at 1661 (holding that the Oversight Board is an entity of the Commonwealth and not the United States). This Title also provides that the Oversight Board "in its sole discretion at such time as [it] determines to be appropriate," may designate or exclude any territorial instrumentality from the requirements of PROMESA. 48 U.S.C. § 2121(d). Title I further provides (with two exceptions related to the enforcement of subpoenas and to petitions for restructuring under Title III) that "any action against the Oversight Board, and *any action* otherwise *arising out of* [PROMESA], *in whole or in part*, shall be brought" in the United States District Court for the District of Puerto Rico. *Id*. at § 2126(a) (emphasis added).

Title III of PROMESA establishes a comprehensive scheme for the restructuring of a territory's debt that specifically incorporates numerous provisions from Chapter 9 and Chapter 11 of the United States Bankruptcy Code. *See id*. at §§ 2161-2177. This Title also establishes a judicial framework, including jurisdictional and venue provisions, for carrying out these restructuring efforts. *See id*. at §§ 2164-2170. Jurisdiction for cases under Title III is in the United States district courts, and in the case of Puerto Rico, venue is in the District

Court for Puerto Rico. *Id.* at §§ 2166-2167. Under PROMESA, the district court is required to confirm the restructuring plan of a debtor if certain conditions are met including that: the plan complies with the provisions of PROMESA and the Bankruptcy Code provisions incorporated into the statute, "the debtor is not prohibited by law from taking any action necessary to carry out the plan," and the plan is feasible and in the best interest of the creditors. 48 U.S.C. § 2174(b). PROMESA also has a unique requirement that "the Chief Justice of the United States shall designate a district court judge to sit by designation to conduct the case." 48 U.S.C. § 2168(a). The Chief Justice designated Judge Laura Taylor Swain of the Southern District of New York to conduct the case. *See Aurelius*, 140 S. Ct. at 1656.

Upon enactment of the statute, Title III imposed an initial temporary automatic stay of claims against the Commonwealth and covered entities. 48 U.S.C. § 2194. The statute vests discretion in the Oversight Board to determine which entities are considered "covered." 48 U.S.C. §§ 2104(7), 2121(d), 2194(b). It also proscribes an automatic stay upon the filing of a Title III petition by the Commonwealth or its instrumentalities. 48 U.S.C. § 2194(d)(2).

## II.    COFINA And The District Court Litigation

Prior to the passage of PROMESA, the Commonwealth "consistently spent more than it received in taxes and other payments," and repeatedly issued general

obligation bonds to raise revenue. *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 987 F.3d 173, 177 (1st Cir. 2021) (*Elliott*). The Commonwealth eventually reached its sovereign debt limits, which restricted its access to the credit markets. *See Elliott*, 987 F.3d at 177. To address the issue, in 2006, the Commonwealth passed Act 91, which established COFINA as a public corporation. *See* P.R. Laws Ann. tit. 13, §§ 11a–16. A primary purpose of COFINA was to issue non-recourse bonds by purportedly deeming a certain percentage of Puerto Rico's SUT revenues to be unavailable to be used to satisfy general public debt, and instead pledging those revenues to COFINA for the issuance of bonds. *See Elliott*, 987 F.3d at 177.

Following PROMESA's enactment, the Oversight Board filed Title III petitions on behalf of the Commonwealth and five Commonwealth instrumentalities including COFINA, which the Oversight Board determined in its discretion to be a covered entity. *See Elliott*, 987 F.3d at 178. During the Commonwealth and COFINA Title III proceedings, an important hurdle to restructuring was whether the Commonwealth or COFINA had superior rights in the SUT revenues that the Commonwealth had pledged to COFINA through legislation. *Id*. at 177-178. The COFINA bondholders asserted that the SUT revenues were the property of COFINA, and should be used to pay COFINA bondholders. In contrast, certain Commonwealth general obligation bondholders argued that pledging the SUT revenues to COFINA was unconstitutional under the

Puerto Rico constitution, and that the revenues should instead be used to pay the general obligation bondholders. *See id.*

In conjunction with the Title III proceedings, the Oversight Board caused the Commonwealth and COFINA to resolve the dispute concerning the SUT revenues through: (1) a publicly noticed mediation open to all interested parties; and (2) an adversary proceeding brought by the Commonwealth against COFINA that, if required, would provide a binding determination concerning the competing claims to the SUT revenues. *See id.* Because the Oversight Board represented both the Commonwealth and COFINA in their respective Title III cases, as part of the set of procedures to resolve the revenue dispute, the Title III Court approved independent agents to serve as the representatives of the Commonwealth and COFINA. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 361 F. Supp. 3d 203, 223-24 (D.P.R. 2019).

The mediation eventually produced agreements that divided the disputed SUT revenues, with 53.65% allocated to COFINA, and the rest to the Commonwealth. Senior and junior COFINA bondholders overwhelmingly voted to support a COFINA-Commonwealth agreement to resolve their competing claims. *See Elliott*, 987 F.3d at 177-78. Under this agreement, junior COFINA bondholders (including plaintiffs) received approximately fifty-five cents on the dollar in new COFINA bonds relative to the par value of their original bonds. *See*

*id*. at 179.  Senior COFINA bondholders received approximately ninety-three cents on the dollar versus the par value of their bonds.

After extensive litigation, and in light of these agreements concerning the SUT Revenues and COFINA bondholder recovery, the district court approved the plan of adjustment for COFINA on February 5, 2019, and the plan was implemented on February 12, 2019.  *See Elliott*, 987 F.3d at 180.  In confirming the plan, the Title III court overruled all objections including those from a number of junior bondholders who alleged, among numerous objections, that the plan violated the Takings Clause by impairing their protected security interests in the SUT revenues.  *See Elliott*, 987 F.3d at 179-80.  On February 8, 2021, the First Circuit affirmed confirmation of the plan, and the Supreme Court denied a petition for certiorari in October 2021.  *Id*. at 185-88; *Elliott v. Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 142 S. Ct. 74 (2021).

## III.  Plaintiffs' Complaint

In their complaint, plaintiffs allege that they owned a "substantial" quantity of First Subordinated (junior) Secured COFINA Bonds providing that principal and interest be repaid in accordance with the terms of the Bond Resolution.

Appx67-74; Appx82 (Compl. ¶¶ 1-8, 14-15, 33).[1]  According to plaintiffs, the

Bond Resolution constituted a contract among COFINA, COFINA bondholders, as

well as the Bank of New York Mellon as trustee and other beneficiaries.  Appx73

(Compl. ¶ 14).  Plaintiffs allege that as specified in the Bond Resolution, they held

a security interest in the COFINA SUT Revenues.  *See* Appx73; Appx82 (Compl.

¶¶ 15, 33).[2]  They further allege that their debt constitutes special revenue debt

otherwise protected under Chapter 9 of the Bankruptcy Code.  Appx79-80 (Compl.

¶ 27).

In their complaint, plaintiffs assert a single takings claim under the Fifth

Amendment based on Congress' enactment of PROMESA.  Appx81-83 (Compl.

¶¶ 32-37).  Plaintiffs allege that on April 29, 2017, under the authority of

PROMESA, the Commonwealth enacted Act No. 246 which allowed the COFINA

SUT revenues to be clawed back to the general treasury where they could be used

to pay Puerto Rico's general obligations, and on May 3, 2017, COFINA then

---

[1] "Appx__" refers to pages in the joint appendix to be filed in this appeal by plaintiffs-appellants.  At the trial court, plaintiffs filed two amended complaints. "Compl. ¶ __" refers to paragraphs in the operative complaint—plaintiffs' second amended complaint filed on November 1, 2022, Appx66-84.

[2] Specifically, plaintiffs alleged a security interest pursuant to the terms of the Bond Resolution in:  (1) the "dedicated" sales tax fund; (2) all COFINA revenues as defined in the Bond Resolution; (3) all right, title, and interest of COFINA and its revenues; and (4) funds, deposits, accounts held by the Trustee. Appx73; Appx82 (Compl. ¶¶ 15, 33).

defaulted on its bonds.  Appx80 (Compl. ¶ 29).  Plaintiffs further allege that

because of PROMESA's automatic stay as applied to COFINA, they lacked a

contractual or judicial remedy once COFINA defaulted on the bonds.  *See* Appx80

(Compl. ¶ 29).

According to plaintiffs, the United States engaged in a taking of their

property which "was the direct, intended, and foreseeable purpose and result of

Congress's enactment of [PROMESA] and the actions it authorized to take

Plaintiffs' property rights for the public purpose of ameliorating Puerto Rico's

financial crisis." Appx82 (Compl. ¶ 35).  Plaintiffs allege that but for enactment of

PROMESA, they would have received payments they were entitled to under the

terms of the COFINA bonds, and would have retained a security interest in the

sales tax fund they could have executed in the event of the default.  Appx82

(Compl. ¶ 35).  Plaintiffs allege that the district court approved the COFINA

readjustment plan over the objection of certain COFINA bondholders, and that the

plan drastically curtailed their bond rights, security for repayment, and value of

their investment.  Appx81 (Compl. ¶¶ 30-31).

Plaintiffs seek compensation based on the fair market value of the bonds as

well as fees, costs, and other expenses.  Appx83-84.

## IV.  The Trial Court's Decision

On June 5, 2023, the trial court issued its decision dismissing plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6).  Appx1-25.

The trial court first disagreed with the Government that it lacked jurisdiction to entertain plaintiffs' takings claims.  The trial court found that section 2126(a) of PROMESA did not provide "the kind of clear congressional intent required to displace [the] court's jurisdiction under the Tucker Act."  Appx14.  Although the trial court acknowledged that Congress has the power to withdraw Tucker Act jurisdiction, including for takings claims, it found that withdrawal by implication is disfavored, and that Congress must demonstrate "unambiguous intention to withdraw the Tucker Act remedy."  Appx14 (quoting *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007)).  The trial court further found that requiring plaintiffs to bring their takings claims in district court would limit the remedies they could seek because PROMESA does not provide a waiver of sovereign immunity allowing for monetary compensation, and that other remedies would be inadequate.  Appx14-16.  The trial court also found that this case was unlike cases where Tucker Act jurisdiction was displaced based on a separate comprehensive remedial scheme because in those circumstances "the alleged taking resulted from a federal agency's action;" and "Congress had created a statutory framework for both administrative and judicial review of that agency's

14

actions." Appx16. The trial court determined that neither condition was met because plaintiffs were alleging a taking by Congress, and PROMESA did not provide a scheme for judicial review of such a claim. Appx16.

The trial court also rejected two other arguments that it lacked jurisdiction to entertain plaintiffs' claims. First, it determined that exercising jurisdiction over plaintiff's takings claims would not require a collateral attack on the district court's decision approving the plan of adjustment under Title III. Appx17-18. The trial court found that plaintiffs could succeed on the merits of their takings claims irrespective of the district court's decision on the plan of adjustment "because the theory of liability behind their takings claims is an attack on Congress's enactment of PROMESA for authorizing the Title III process in the first place." Appx18. Second, the trial court found that it did not lack jurisdiction based on the fact that the alleged taking of plaintiffs' property interest included a series of discretionary decisions by the Oversight Board which does not constitute the United States for statutory and constitutional purposes. Appx12-13. Although the trial court acknowledged that the actions of the Oversight Board were relevant with respect to the question as to whether plaintiffs stated a takings claim, according to the trial court, they did not affect the court's jurisdiction over plaintiffs' takings claims predicated on Congress's enactment of PROMESA. Appx13.

The trial court, however, held that Congress's enactment of PROMESA was insufficient Government action to support a takings claim, and dismissed plaintiffs' complaint on that basis. Appx3-4; Appx20; Appx23-25. The trial court concluded that "nothing was taken from [plaintiffs] by the mere passage of PROMESA," and instead, based on plaintiffs' takings allegations, "their property interests were impaired only after the Oversight Board, a non-federal entity, took a series of actions." Appx23. Relying on *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1153 (Fed. Cir. 2014), the trial court addressed takings liability in the context of when the Federal Government instigates action by a third party. Appx23. The trial court recognized that this Court has highlighted two principles with respect to third party action. First, "government action directed to a third party does not give rise to a taking if its effects on the plaintiff are merely unintended and collateral." Appx23 (quoting *A & D Auto Sales,* 748 F.3d at 1153). Second, "even if the effects on plaintiff are direct and intended, takings liability is limited to the circumstances in which 'the third party is acting as the government's agent or the government's influence over the third party was coercive rather than persuasive." *Id*.

The trial court reasoned that to recover on their takings claims, plaintiffs would need to show that: "(1) Congress enacted PROMESA with the intent to restructure COFINA's debts and take plaintiffs' property interests as COFINA

16

bondholders; and (2) either the Oversight Board acted as an agent of the United States in filing a Title III petition for COFINA or the United States coerced the Oversight Board to do so." Appx23-24. The trial court found that even if it assumed that Congress intended to restructure COFINA's debts despite no mention of COFINA, plaintiffs could not get past the second hurdle. Appx24. The trial court found that plaintiffs had disclaimed any reliance on a coercion theory. Appx24. And in any event plaintiffs were unable to establish either agency or coercion in light of the fact that the Supreme Court had already held that the Oversight Board is a territorial entity that "acts not on behalf of the United States, but on behalf of, and in the interests of Puerto Rico, *Aurelius*, 140 S. Ct. at 1662, and no reading of PROMESA required the Oversight Board to implement Title III proceedings on behalf of COFINA. Appx24. Instead, the trial court found that PROMESA expressly provided for the Oversight Board to act in its "sole discretion" at each necessary step for the restructuring of COFINA's debts. Appx24.

The trial court also rejected plaintiffs' argument that any congressional authorization provided by PROMESA was sufficient to establish takings liability. *See* Appx3-4; Appx23-24. In sum, the trial court found that "Congress's

enactment of PROMESA is not sufficient federal government action to constitute a taking," and dismissed plaintiffs' complaint for failure to state a claim. Appx25.[3]

## SUMMARY OF THE ARGUMENT

The Court should affirm the trial court's decision dismissing plaintiffs' takings claim. To start, the trial court lacked jurisdiction over plaintiffs' complaint because Congress explicitly directed that all cases arising under PROMESA, "in whole or in part," shall be pursued in the District of Puerto Rico. Through section 2126(a), Congress channeled all actions arising out of PROMESA to district court, and thus precluded the trial court from exercising jurisdiction over plaintiffs' suit which attacks the statute itself, and therefore arises out of PROMESA.

In addition, the trial court correctly held that plaintiffs failed to identify sufficient Government action to support a takings claim based on the mere enactment of PROMESA. PROMESA simply establishes a general mechanism for the restructuring of territorial debt, and plaintiffs' alleged taking of property is necessarily predicated on a myriad of discretionary actions of a non-Federal entity—the Oversight Board—which cannot be attributed to the Federal Government for takings purposes. Nor can plaintiffs challenge the numerous

---

[3] The trial court also rejected our arguments that the statute of limitations and collateral estoppel barred plaintiffs' claims and that plaintiffs lack a cognizable property interest. Appx21-23. The trial court did not reach our arguments that PROMESA did not take plaintiffs' contract rights and that plaintiffs cannot assert a regulatory takings claim under *Penn Central*.

18

decisions of the district court in confirming the plan of adjustment including the court's decision to find that the property interests of junior COFINA bondholders had not been taken.

Moreover, even if the Court were to apply a takings test, it would be the *ad hoc* factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), and all three factors weigh against finding a taking here. Finally, the trial court did not abuse its discretion in denying plaintiffs' request to amend their complaint given that any amendment would be futile for the reasons stated above.

## ARGUMENT

### I.    Standards Of Review

The Court reviews "whether the Court of Federal Claims possesses subject matter jurisdiction de novo." *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009) (citation omitted).  As a general matter, "'the allegations stated in the complaint are taken as true and jurisdiction is decided on the face of the pleadings.'" *Folden v. United States,* 379 F.3d 1344, 1354 (Fed. Cir. 2004) (quoting *Shearin v. United States*, 992 F.2d 1195, 1195-96 (Fed. Cir. 1993)).  But when jurisdiction is challenged as a factual matter, the allegations in the complaint do not control and only uncontroverted factual allegations are accepted as true, *see*, *e.g.*, *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir.

2014).  Indeed, "[f]actual allegations must be enough to raise a right to relief above a speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007) ("a wholly conclusory statement of claim" cannot "survive a motion to dismiss" by simply leaving "open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery").

Challenges to the trial court's denial of a motion to amend a complaint is reviewed for abuse of discretion.  *Taylor v. United States*, 959 F.3d 1081, 1091 (Fed. Cir. 2020).

## II.    Pursuant To 48 U.S.C. § 2126(a), The Trial Court Does Not Possess Jurisdiction To Entertain Plaintiffs' Complaint

As a threshold matter, the trial court erred in failing to find that it lacked jurisdiction to entertain plaintiffs' takings claims pursuant to 48 U.S.C. § 2126(a). The trial court possesses limited jurisdiction.  *Marcum LLP v. United States*, 753 F.3d 1380, 1382-83 (Fed. Cir. 2014).  The trial court's authority to grant relief against the United States is based on the extent to which the United States has waived sovereign immunity.  *United States v. Testan*, 424 U.S. 392, 399 (1976). Pursuant to the Tucker Act, the trial court possesses jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department."  28 U.S.C. § 1491(a)(1).  As a general matter, the trial court therefore has jurisdiction to entertain takings claims seeking just compensation because such

20

claims are founded on the Fifth Amendment's Takings Clause, a money mandating source of law. *See Eastern Enters. v. Apfel*, 524 U.S. 498, 520 (1998) (plurality opinion) (explaining that "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute."); *United States v. Causby*, 328 U.S. 256, 267 (1946).

It is well established, however, that Congress may specify the forum in which particular claims may be heard, and it may displace the trial court's jurisdiction, including over constitutional takings claims. *See Eastern Enters.*, 524 U.S. at 520; *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 12, 1990; *Horne v. Dep't of Agric.*, 569 U.S. 513, 526-27 (2013); *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1097-98 (Fed. Cir. 2018) (concluding jurisdiction for takings claim concerning Federal Communications Commission license displaced through the comprehensive scheme of the Communications Act). To find displacement of the trial court's jurisdiction to entertain a takings claim Congress must exhibit "an unambiguous intention to withdraw the Tucker Act remedy." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984); *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (2007).

Here, the plain language of section 2126(a) establishes Congress' unambiguous intent that all claims arising out of PROMESA be brought in district

court.  As with all issues of statutory interpretation, in assessing whether plaintiffs'

claim properly belongs in this Court, the Court must "begin 'with the language of

the statute.'" *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976

(2016) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)); *Estate of

Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992).  "Where the statutory

language provides a clear answer, the analysis ends there."  *Ravin v. Wilkie*, 956

F.3d 1346, 1350 (Fed. Cir. 2020) (citing *Hughes Aircraft Co. v. Jacobson*, 525

U.S. 432, 438 (1999)).  "It is a fundamental canon of statutory construction that . . .

words will be interpreted as taking their ordinary, contemporary, common

meaning."  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (internal

quotations marks and citation omitted).

Under the statute, Congress has expressly provided that jurisdiction lies in

the Federal district court in Puerto Rico for any action arising out of PROMESA,

whether in whole or in part:

> Except as provided in section 2124(f)(2) of this title
> (relating to the issuance of an order enforcing a
> subpoena), and subchapter III (relating to adjustments of
> debts), any action against the Oversight Board, and *any
> action otherwise arising out of this chapter, in whole or
> in part, shall be brought* in a United States district court
> for the covered territory . . .

48 U.S.C. § 2126(a) (emphasis added).  Accordingly, the plain language of Section

2126(a) provides a clear answer that Congress intended that all suits relating to

PROMESA be heard in district court by requiring that "any action" "arising out of" PROMESA "shall" be brought in district court.

Plaintiffs' takings suit "arises out of" PROMESA, if not "in whole" then certainly at least "in part," because their takings claims are explicitly based on Congress's enactment of PROMESA. *See, e.g.*, Appx81 (Comp. ¶ 31) ("As a direct and intended result of Congress's enactment of the Act, COFINA Bondholders lost a significant portion of the principal and interest each COFINA Bondholder was entitled to. . . ."); *see also Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1583, 1586 (Fed. Cir. 1994) (holding that use of "arising out of" language in jurisdictional statute reflected congressional intent to give the Court of International Trade "broad exclusive jurisdiction" over matters arising under trade statutes); *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 101 (2002) (finding in the context of contracts that the words "arising out of" are "broad, general, and comprehensive terms," and "are ordinarily understood to mean 'originating from,' having its origin in,' 'growing out of,' or 'flowing from,' or in short 'incident to, or having connection with.'") (citations omitted). In addition to its use of the expansive phrase "arising out of," Congress clearly mandated suit in district court through its use of the phrases "any action" and "shall be brought." *See, e.g., Lexecon Inc. v. Milberg Weiss Berhad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to

judicial discretion."); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (determining that "the word 'any' has an expansive meaning"). Therefore, based on the broad, clear, and mandatory language of the statute, PROMESA required plaintiffs to bring their takings action in the District Court for Puerto Rico, thus precluding any avenue for relief in the Court of Federal Claims.

In addition, although the plain language of section 2126(a) is sufficient in and of itself to establish the displacement of Tucker Act jurisdiction, the purpose of the statutory provision and the structure of PROMESA only serve to reinforce the same conclusion. Through PROMESA, Congress established a comprehensive scheme concerning all matters related to the Oversight Board; and, all matters related to the restructuring of Puerto Rico's debt. *See* 48 U.S.C. § 2194(m) ("A *comprehensive approach* to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico is necessary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process.") (emphasis added). And section 2126(a) served to effectuate that scheme by requiring that all actions arising in whole or in part out of PROMESA be brought in district court. By specifying that all claims arising under PROMESA must be brought in a single court, Congress ensured that all litigation related to the Oversight Board and its restructuring activities would proceed in a single,

convenient, local forum rather than in a scattershot manner across myriad jurisdictions, which could create uncertainty and delay the eventual resolution of Puerto Rico's debt crisis. *See* 48 U.S.C. § 2126(a).

Indeed, the actual restructuring proceedings involving Puerto Rico and its instrumentalities serve to demonstrate the wisdom of the scheme that Congress created. Over several years, following the passage of PROMESA, the district court under Title III, the First Circuit, and the Supreme Court have adjudicated an avalanche of claims and objections concerning the Oversight Board and arising out of PROMESA, including takings and other constitutional claims. *See, e.g., Elliott*, 987 F.3d at 177-180 (summarizing a portion of the litigation concerning just one debtor—COFINA).

In its decision, the trial court erred in refraining from enforcing the plain language of section 2126(a). In rejecting the Government's jurisdictional argument, the trial court conducted only a cursory analysis of the statutory language, "assuming" that plaintiffs' takings claims arose out of PROMESA, in whole or in part, but then failing to find that the language covered plaintiffs' claims. Appx14. But if the statutory provision is unambiguous that plaintiffs' takings claims must be brought in district court pursuant to section 2126(a), then that is the end of the inquiry, and the trial court cannot create an ambiguity where none exists on the face of the statute. *See United States v. Culbert*, 435 U.S. 371,

379 (1978) (finding statute clear and refusing to "manufacture ambiguity where none exists"); *Capela Sales & Servs. Ltd. v. United States, Aluminum Extrusions Fair Trade Comm.*, 878 F.3d 1329, 1334 (Fed. Cir. 2018); *Ravin*, 956 F.3d at 1350.[4]

Indeed, none of the decisions relied on by the trial court for the proposition that Congress must express unambiguous intent are inconsistent with a finding of Tucker Act displacement in light of the statutory language at issue in those cases. In *Acceptance Insurance Companies Inc. v. United States*, 503 F.3d 1328 (Fed. Cir. 2007) this Court held that 7 U.S.C. § 1506(d) which provided that "[t]he district courts of the United States . . . shall have exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the [FCIC]" did not provide unambiguous intent to displace Tucker Act jurisdiction because "a takings claim is properly brought against the United States, not against a particular Federal agency." *Acceptance*, 503 F.3d at 1336-37. In contrast, here,

---

[4] In *Altair Global Credit Opportunities Fund (A), LLC v. United States*, 138 Fed. Cl. 742 (2018) (*Altair I*), the Court of Federal Claims found that PROMESA does not displace Tucker Act jurisdiction with respect to the plaintiff's takings claims in that case. *Altair I*, 138 Fed. Cl. at 754-60. However, that decision is not binding, and it relies on a similar, erroneous statutory analysis that disregards the plain language of section 2126(a). And in that decision, the Court also held that the Oversight Board constituted the United States with respect to the plaintiffs' takings claims. *Altair I*, 138 Fed. Cl. at 760-64. In a unanimous decision, the Supreme Court later found that the Oversight Board is a territorial entity. *Aurelius*, 140 S. Ct. at 1661.

the trial court did not identify any textual argument that the plain language of section 2126(a) fails to cover plaintiffs' takings claims.[5]

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018-19 (1984), the Supreme Court rejected the argument that statutory language in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) demonstrated an unambiguous intent to displace a Tucker Act remedy where the statute stated that a submitter of certain trade secret data who failed to follow a statutory procedure "shall forfeit the right to compensation for the use of the data in support of the application." *Id*. at 1018 (citation omitted). The Court found that the statutory provision simply provided for an exhaustion requirement as a condition to a Tucker Act claim, and that therefore "it [was] entirely possible for the Tucker Act and FIFRA to co-exist." *Id*. But in this case, it is not possible for the Tucker Act and section 2126(a) to co-exist because Congress has mandated that all claims arising out of PROMESA be brought in district court. Any interpretation of section 2126(a) that carves out takings claims under the Tucker Act contradicts the plain statutory text.

---

[5] To the extent plaintiffs intend to argue that their action arose solely out of the Fifth Amendment, that argument lacks merit. The Supreme Court rejected a similar argument as "fruitless" when the plaintiffs argued that their claim arose solely out of the Constitution and not also out of the Social Security Act. *See Weinberger v. Salfi*, 422 U.S. 749, 760-61 (1975). An action may plainly arise out of multiple sources of law.

Before the trial court, plaintiffs also relied on *Preseault v. Interstate Commerce Comm.*, 494 U.S. 1, 12 (1990), but the statutory language in that case is even further afield. In *Preseault*, the Government pointed to language stating that "[n]otwithstanding any other provision of this Act, authority to enter into contracts, and to make payments, under this Act shall be effective only to such extent or in such amounts as are provided in advance in appropriation Acts." *Id*. at 12-13. The Government argued that Congress prevented recourse to the Tucker Act by conditioning the expenditure of funds with respect to the real property conversions at issue. *Id*. Although the Supreme Court rejected the argument that Congress expressed unambiguous intent to withdraw the Tucker Act remedy, the vague statutory language in *Preseault* concerning appropriations is simply not comparable to the language in section 2126(a) specifying the exclusive forum for all claims arising out of PROMESA.

In finding that section 2126(a) did not displace the trial court's jurisdiction over plaintiffs' takings claims, the trial court focused on the fact that plaintiffs remedies would be limited in district court because PROMESA does not contain an unequivocal waiver of sovereign immunity for monetary relief, and equitable relief is generally unavailable as long as an adequate provision for obtaining just compensation exists. *See* Appx14-15. Although we agree that equitable relief for a takings claim is generally unavailable, *Ruckelshaus*, 467 U.S. at 1016-17, and

that PROMESA does not waive the Government's sovereign immunity for a claim for just compensation, neither circumstance precludes the finding of Tucker Act displacement here given the plain language of section 2126(a). As the trial court recognized, plaintiffs had avenues of relief in district court with respect to their takings claims including a claim under the Little Tucker Act, as well as potential injunctive and declaratory relief to prevent any taking from occurring, and to fashion a remedy during the restructuring proceeding. *See Eastern Enterprises*, 524 U.S. at 521 ("[T]he Declaratory Judgment Act 'allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.'") (citation omitted); Appx15-16. Such declaratory relief would have been particularly appropriate here given that Congress specifically provided that no Federal funds were to be used to pay Puerto Rico's debts, 48 U.S.C. § 2150(c), and therefore Congress could not be interpreted as intending for debt holders to turn around and simply receive compensation in the trial court against the United States. *See Eastern Enterprises*, 524 U.S. at 517-19 ("Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for '[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation.'") (citation omitted).

In fact, although the Tucker Act generally provides for suits to obtain compensation for a taking, that avenue has been found to be unavailable where Congress would not have intended to pay compensation if the particular statute or its application were found to constitute a taking; instead Congress would have intended courts to invalidate the statute or its application and "grant[] equitable relief for Takings Clause violations" arising from the absence of compensation. *Eastern Enters.*, 524 U.S. at 520-522; *see Horne*, 569 U.S. at 528 (following *Eastern Enterprises* and allowing challenge to administrative action rather than subsequent compensation action); *Babbitt* v. *Youpee*, 519 U.S. 234, 243-45 (1997).

None of the authorities relied on by plaintiffs or the trial court stand for the proposition that for Tucker Act displacement to occur, Congress must provide a takings claimant with the exact remedy they could obtain in the trial court under the Tucker Act. *See Alpine*, 878 F.3d at 1097-98; Appx14-15.

Congress has expressed a clear, unambiguous intent to vest jurisdiction for all claims arising under PROMESA in the District Court for Puerto Rico. Accordingly, the trial court lacked jurisdiction over plaintiffs' takings claims.

## III. The Alleged Government Actions At Issue Cannot Give Rise To Takings Liability

Even if the Court finds that the trial court possessed jurisdiction to entertain plaintiffs' takings claims, the Court should affirm the trial court's dismissal for

failure to state a claim because plaintiffs fail to identify Government action

plausibly establishing a takings claim.

### A.    Takings Liability For The Actions Of Third Parties

A threshold consideration in adjudicating all takings claims is whether the

complaint has alleged "government action sufficient to invoke a takings analysis."

*A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1153 (Fed. Cir. 2014).

That is because the Takings Clause applies only to governmental action. *See Alves*

*v. United States,* 133 F.3d 1454, 1458 (Fed. Cir. 1998).  In *A & D Auto Sales*, this

Court highlighted two overarching principles with respect to government liability

for third party actions.  First, "government action directed to a third party does not

give rise to a taking if its effects on the plaintiff are merely unintended and

collateral." *A & D Auto Sales,* 748 F.3d at 1153.  Second, even if the effects on

plaintiff are direct and intended, takings liability is limited to the circumstances in

which "the third party is acting as the government's agent or the government's

influence over the third party was coercive rather than persuasive." *See id*.  In

addition, this Court has recognized that Government action that is too attenuated

from the alleged taking is insufficient to ascribe liability to the Federal

Government.  *See Welty v. United States*, 926 F.3d 1319, 1326 (Fed. Cir. 2019); *B*

*& G Enters., Ltd. v. United States*, 220 F.3d 1318, 1323-24 (Fed. Cir. 2000); *Tex.*

*State Bank v. United States,* 423 F.3d 1370, 1376-77 (Fed. Cir. 2005); *Erosion*

*Victims of Lake Superior Regulation v. United States,* 833 F.2d 297, 300-01 (Fed. Cir. 1987).

## B.     Plaintiffs Cannot Directly Base Their Takings Claims On The Actions Of The Oversight Board And The District Court

As the trial court properly recognized, plaintiffs have not, and cannot, directly base their takings claim on the actions of the Oversight Board because the Board plainly does not constitute the Federal Government.  Appx3-4.  Indeed, in *Financial Oversight & Management Board for Puerto Rico v. Aurelius Investments, LLC*, 140 S. Ct. 1649 (2020), a unanimous Supreme Court extinguished any argument that the Oversight Board constitutes the United States. The Supreme Court held that "Congress did not simply state that the Board is part of the *local Puerto Rican government*.  Rather, Congress also gave the Board a structure, a set of duties, and related powers all of which are consistent with this statement." *Aurelius,* 140 S. Ct. at 1661 (emphasis added).[6]  The Court also held that although the Oversight Board can initiate bankruptcy proceedings, "in doing so, it acts not on behalf of the United States, but on behalf of, and in the interests,

---

[6] Although the Supreme Court did not find the statutory provision dispositive, in PROMESA, Congress expressly created the Oversight Board "as an entity within the territorial government" of Puerto Rico, and specified that the Oversight Board "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government."  48 U.S.C. § 2121(b)-(c) (emphasis added).

of Puerto Rico." *Id*. at 1662; *see also Altair Global Credit Opportunities Fund (A), LLC v. United States*, 151 Fed. Cl. 276, 284-88 (2020) (*Altair II*) (holding that the Oversight Board is not the United States for purposes of bondholders' takings claim).

In this case, plaintiffs' takings claims challenge a series of discretionary decisions of the Oversight Board including: (1) its designation of COFINA as a covered entity and subject to the statute's automatic stay; (2) its decision to commence Title III proceedings on behalf of COFINA; (3) its decision to attempt to resolve the SUT revenues dispute through a negotiated settlement; and (4) its decision to put forth a plan of adjustment for approval which adjusted plaintiffs' recovery with respect to its bonds. *See Elliott*, 987 F.3d at 177; Appx80-81 (Comp. ¶¶ 29-31); App. Br. 17, 21. However, because the Oversight Board is inarguably not the United States for statutory and constitutional purposes plaintiffs cannot directly predicate their takings claim on the contention that the Oversight Board caused the taking. *See Aurelius,* 140 S. Ct. at 1661; *Altair II*, 151 Fed. Cl. at 284-88.

Moreover, although plaintiffs allege that the district court's decision to confirm COFINA's restructuring plan severely curtailed their property rights and the value of their bonds, *see* Appx81; App. Br. 17, 21, plaintiffs may not base their takings claim on a challenge to the district court's decision approving the

restructuring plan. In confirming COFINA's restructuring plan which, after extensive negotiation and litigation allowed plaintiffs to receive approximately fifty-five cents on the dollar with respect to the par value of their bonds, the district court rejected claims from junior COFINA bondholders that the confirmation plan effected a regulatory taking of the bondholders' liens on the SUT revenues, and the First Circuit affirmed. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 361 F. Supp. 3d, 203, 243-244 (D. P.R. 2019). Plaintiffs cannot directly challenge the district court's decision that, they say, ultimately curtailed their property rights because it is well established that the Court of Federal Claims has no authority to review (and here reverse) the holdings of other Federal courts. *See, e.g.*, *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1352 (Fed. Cir. 2015) ("Binding precedent establishes that the Court of Federal Claims has no jurisdiction to review the merits of a decision rendered by a federal district court." (citations omitted)); *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1384-86 (Fed. Cir. 2017); *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994); *Allustiarte v. United States*, 256 F.3d 1349, 1351-52 (Fed. Cir. 2001).

## C. Plaintiffs Cannot Establish That Any Effects Of PROMESA On COFINA Bonds Were Direct And Intended, Or That The Government Is Liable For The Discretionary Decisions Of The Oversight Board

Given that plaintiffs must demonstrate sufficient Federal Government action for takings liability but cannot directly challenge the actions of the district court

and the Oversight Board, plaintiffs turn their sights to Congress's decision to enact PROMESA itself. But plaintiffs fail to plead sufficient factual allegations establishing that Congress enacted PROMESA with the intent to restructure COFINA's debts and take plaintiffs' property interests as COFINA bondholders. Nor can plaintiffs establish that Congress sufficiently instigated the actions of the Oversight Board and district court for takings liability to attach to the Federal Government.

To start, plaintiffs have not set forth sufficient factual allegations that any alleged extinguishment of plaintiffs' property rights as COFINA bondholders, including their liens on the SUT revenues, was the direct and intended result of PROMESA's enactment. *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014). Although plaintiffs conclude that the United States engaged in a taking of their property which "was the direct, intended, and foreseeable purpose and result of Congress's enactment of [PROMESA] and the actions it authorized to take Plaintiffs' property rights for the public purpose of ameliorating Puerto Rico's financial crisis," and that Congress purportedly targeted COFINA debt, Appx82 (Compl. ¶ 35), App. Br. 38, these legal conclusions are plainly insufficient for plaintiffs to meet their pleading burden. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And the facts that plaintiffs do allege with

respect to the targeting of COFINA bonds are striking in their disconnect from the actual provisions of PROMESA.

In their complaint, plaintiffs nakedly allege that Congress targeted secured and special revenue debt, including the COFINA bonds, which would have been protected under a Chapter 9 municipal bankruptcy. Appx79-80 (Compl. ¶ 27). In particular, plaintiffs quote a statement from Congressman Bruce L. Poliquin stating that it "is also important to remember that much of Puerto Rico's $72 billion worth of debt is what is known as special revenue debt, which enjoys unique protections under Chapter 9" and "would be protected from restructuring." Appx79-80 (Compl. ¶ 27). But these allegations, including the legislative history excerpt relied on by plaintiffs, are disconnected from the provisions of PROMESA, which specifically incorporate provisions of the Code addressing the treatment and protection of such debt. *See* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. §§ 552, 922, and 928). In other words, PROMESA cannot be read to target special revenue debt as plaintiffs contend, because Congress in enacting PROMESA incorporated the same protections from Chapter 9 of the Bankruptcy Code. Plaintiffs' real dispute is with the Oversight Board and the district court for not sufficiently protecting their property interests in accordance with the terms of the statute.

In support of their contention that Congress specifically targeted COFINA bonds, plaintiffs also allege that Congress utilized a "unique" definition of the term

"bond claim" that did not exist under the Bankruptcy Code, Appx78 (Comp. ¶ 24).

However, PROMESA's definition of bond claim simply tracks word-for-word the

definition of "claim" in the Bankruptcy Code, thereby supporting that PROMESA

did not jettison any Code provisions that would have protected plaintiffs' debt in

this way. *Compare* 48 U.S.C. § 2104(3) *with* 11 U.S.C. § 101(5).

Although not mentioned in their complaint, in their opening brief, plaintiffs

reference a single mention of COFINA bonds in PROMESA's legislative history

for the proposition that "allowing Puerto Rico to restructure under Chapter 9 would

exclude COFINA, allowing restructuring of only 30% of Puerto Rico's debt," and

that Congress apparently targeted COFINA bonds. App. Br. 12. But once again,

plaintiffs fail to tie this statement from "one of the early hearings on Puerto Rico's

debt crisis" to the actual provisions of PROMESA. Further, as the First Circuit has

held, PROMESA requires that a confirmation plan only be confirmed on a finding

that the debtor "is not prohibited by law from taking any action" including

discharging a debt "necessary to carry out the plan," which precludes confirmation

in the scenario where discharge would violate the Takings Clause. *See In re Fin.*

*Oversight & Mgmt. Bd. for Puerto Rico*, 41 F.4th 29, 40-41 (1st Cir. 2022)

(quoting 48 U.S.C. § 2174(b)(3)). In other words, to the extent that plaintiffs

possessed property interests that if extinguished by restructuring under PROMESA

would have violated the Takings Clause, the statute itself addressed this

circumstance and precluded such action from taking place.  48 U.S.C.

§ 2174(b)(3).[7]  Although plaintiffs sat on their rights and did not challenge the

restructuring plan in the district court proceeding, plaintiffs certainly had that

opportunity, which directly undermines that PROMESA actually targeted

plaintiffs' property in a manner sufficient for takings liability.

In addition, as the trial court correctly held, and plaintiffs concede, there is

no argument that Congress directed or coerced the Oversight Board into taking

discretionary actions in restructuring COFINA's debt, nor is there any argument

that the Oversight Board was acting as an agent of the United States in addressing

COFINA's debt.  *A & D*, 748 F.3d at 1153; Appx23-24.  Accordingly, although

plaintiffs superficially base their takings claims on the enactment of PROMESA,

*see* Appx78-80, Appx82-83 (Comp. ¶¶ 21-29, 35-36), the enactment of the statute

itself did not place COFINA within the Title III restructuring process, nor

predetermine the key takings allegation in this suit—the recovery for bondholders

such as plaintiffs under the plan of adjustment.  Indeed, no provision of

PROMESA requires that COFINA or any other instrumentality of the

Commonwealth be designated as a debtor under Title III, or that creditors receive a

certain monetary recovery under a plan of adjustment.  Those were decisions made

---

[7] Similarly, Senator Grassley's speculation that "[s]hould the law be found unconstitutional under the Takings Clause, then the Federal government would be liable for money damages," App. Br. 20, adds nothing to the analysis.

by the Oversight Board and the district judge.  Nor does the statute allow for

approval of a restructuring plan if discharging a debt were to violate the Takings

Clause.  Rather, PROMESA simply provides a generalized legal framework for

restructuring of territorial debt.  It does not dictate or direct any particular outcome

or even require that Puerto Rico avail itself of the Title III mechanism.  Congress

left the decisions regarding which Puerto Rican entities would be subject to or

excluded from restructuring, and the parameters of the plan of adjustment, to the

discretion of the Oversight Board, 48 U.S.C. § 2121(d), which as established

above, is part of the Commonwealth government.

### D.     The Cases Plaintiffs Rely On To Establish Takings Liability Are Inapposite

Plaintiffs contend that the trial court erred by "overlook[ing] the well-

established principle that government action authorizing a third party to take

private property can constitute a taking."  App. Br. 28, *see* App. Br. 27-38.

Plaintiffs are mistaken.  The trial court correctly held that mere authorization from

a general statute like PROMESA is insufficient Government conduct to ascribe

takings liability where the claim is predicated on a series of discretionary acts by

an entity that is indisputably not the United States—the Oversight Board.  *See*

Appx3-4; Appx23-24.  Accordingly, the cases that plaintiffs rely on are inapposite

in addressing the salient question here—whether the United States is liable for the

taking of plaintiffs' property through a series of discretionary acts undertaken by a

third party and a court under the enactment of a general statutory framework such as PROMESA.

In support of their argument that authorization is sufficient for takings liability, plaintiffs rely on several cases finding a taking where the government directly authorized a physical invasion of real property. App. Br. 28-30; *Cedar Point Nursey v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (California statute authorized physical invasion of land by unions organizers); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440-41 (1982) (statute authorized physical invasion of plaintiff's building by requiring installation of cable wire); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 832 (1987) (physical easement over private land provided to public by government for beach access); *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) (physical easement in access to private pond taken); *Hendler v. United States*, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (forced installation of monitoring equipment on private land a physical taking).[8]

As an initial matter, and as the trial court recognized, plaintiffs have failed to allege a physical taking of real property, and so none of the cases are specifically germane to the inquiry. *See* Appx24 (quoting *Tahoe-Sierra Council, Inc. v. Tahoe*

---

[8] Plaintiffs also rely on *Preseault v. United States*, 100 F.3d 1525, 1531 (Fed. Cir. 1996) (*en banc*). App. Br. 30. *Preseault* involved a specific statutory provision through which Congress effected a physical taking by allowing for the creation of easements in certain real property. *See id*. at 1550-51; *Preseault v. I.C.C.*, 494 U.S. 1, 7-8 (1990).

*Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002)).  In any event, and more importantly, all of these cases involve a *direct* authorization to invade or occupy property.  Indeed, in each of the cases involving a statute, the statute contained a specific provision directly providing on its face for the invasion of property.  *See Cedar Point*, 141 S. Ct. at 2072; *Loretto*, 458 U.S. at 440-41; *Preseault*, 494 U.S. at 7-8.  Plaintiffs point to no specific provision of PROMESA that is analogous.  Nor can they—PROMESA simply provides a general framework for the restructuring of the debt of territories, but leaves any action to the discretion of others, namely the Oversight Board and the district judge.  This separates this case from the physical takings cases plaintiffs rely on which, as noted, all involve a direct authorization to invade property.  Indeed, as set forth above, plaintiffs' comparison is particularly unpersuasive because plaintiffs have failed to establish that PROMESA's statutory provisions directly targeted COFINA bonds.

Similarly, plaintiffs' reliance on *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155 (1980) and *Louisville Joint Stock Bank v. Radford*, 295 U.S. 555 (1935) are inapt.  *See* App. Br. 31-32.  Both decisions involve specific statutory provisions that on their face provide direct authorization for an action that constitutes a taking.  *See Webb's*, 449 U.S. at 159-160; *Louisville Joint Stock Bank*, 295 U.S. at 574-75.  No similar circumstance exists here. Indeed, under plaintiffs' view, the Federal Government would be liable for any actions of the Oversight

Board or the district court, no matter how far removed from the provisions of the statute and notwithstanding that plaintiffs had the opportunity to participate directly in the proceedings before the district court, but failed to do so.  In essence, plaintiffs suggest that the mere fact that there were restructuring proceedings brought on behalf of COFINA is sufficient in and of itself to ascribe takings liability to Congress, irrespective of how the proceedings were mandated to turn out under the statutory framework.  But they point to no case finding liability in analogous circumstances.

In sum, the Government action at issue here falls short of the type of action that courts have recognized to be sufficient for takings liability, and accordingly, the Court should affirm the trial court's dismissal.

## IV.    PROMESA Did Not Take Plaintiffs' Contract Rights

Alternatively, even if plaintiffs alleged sufficient Government action to plead a takings claim, their claim should nevertheless be dismissed because the Government did not take plaintiffs' contract rights.  Although plaintiffs devote much of their complaint to allegations that Congress effected a taking of various contract rights including in the form of the right to be repaid principal and interest, and the right to enforce their security interest pursuant to the terms of the Bond Resolution, *see* Appx73-74, Appx77-78, Appx80-83 (Comp. ¶¶ 14-15, 23-24, 29-30, 34-36), under controlling Supreme Court and Federal Circuit precedent, the

mere frustration of contract rights is insufficient to establish a takings claim as a matter of law.

A contract may constitute property under the Takings Clause, *see, e.g., Lynch v. United States,* 292 U.S. 571, 579 (1934), but the Government "does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights." *Palmyra Pacific Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009). The Supreme Court's decision in *Omnia Commercial Co., Inc. v. United States*, 261 U.S. 502 (1923) has long stood for the proposition that the Government does not take contract rights by taking the subject matter of a contract, or frustrating the purpose of the contract. *Id*. at 510-11.

Here, at most, plaintiffs allege that Congress made it more difficult for them to obtain the contracted performance from COFINA under the terms of the Bond Resolution, thereby frustrating contract performance, and decreasing the value of their contract rights. *See* Appx82-83 (Comp. ¶ 35-36). But, under *Omnia*, that does not constitute a taking under the Fifth Amendment. 261 U.S. at 511; *accord Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1380 (Fed. Cir. 2008) (holding that Government action that "frustrated" plaintiff's "business expectations . . . does not form the basis of a cognizable takings claim").

Before the trial court, plaintiffs relied on *Cienega Gardens v. United States*, 331 F.3d 1319, 1335 (Fed. Cir. 2003) for the proposition that PROMESA went beyond the frustration of contract rights, and that *Omnia* and its progeny do not apply where a statute specifically targets contract rights. *See* Appx172. *Cienega* is readily distinguishable. First, *Cienega* involved a property interest that was "based on the interaction of both real property rights and contractual rights," and the claim at issue was predicated on the Government having appropriated a real property right. *Cienega*, 331 F.3d at 1328-29; *see Palmyra*, 561 F.3d at 1368. Second, although the Government was not a party to the mortgage contracts in *Cienega*, it was involved in their issuance and had executed related agreements with the property owners. *See Cienega*, 331 F.3d at 1325. This Court found that Congress specifically enacted the statute to directly restrict a particular contract provision with respect to the mortgages of a few property owners. *Id*. at 1338-39. The Court held that the Government was not bringing the contract to an end but was keeping the contract "alive for the use of the government." *Id*. at 1335.

This case involves no similar circumstances. Indeed, although plaintiffs summarily contend that Congress targeted specific contractual provisions in the Bond Resolution, as demonstrated above, plaintiffs allegations are divorced from the actual provisions of the statute. Plaintiffs fail to make any allegation, let alone a non-speculative one, that Congress was even aware of specific provisions of

COFINA's debt agreements. This stands in sharp contrast to *Cienega* where Congress was plainly aware of the agreements at issue, and specifically targeted a particular contractual provision in its legislation. 331 F.3d at 1335.

In addition, that plaintiffs have not sufficiently alleged that the United States took their contract rights is only confirmed by the fact that plaintiffs had the opportunity to enforce their contract through the district court proceedings even after Congress enacted PROMESA. *See Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016); *Altair II*, 151 Fed. Cl. at 293 ("The Court's conclusion that the plaintiffs' contract was not taken is reinforced by the fact that the plaintiffs may seek to enforce their rights under the contract through [an] action *in the Title III forum*.") (emphasis added).

In sum, because Government action that incidentally affects contract rights does not constitute a taking, and because even after PROMESA was enacted plaintiffs could seek to enforce their contract in the district court, plaintiffs cannot establish that their contract rights were taken. *See Omnia*, 261 U.S. at 510; *Piszel*, 833 F.3d at 1377; *Altair II*, 151 Fed. Cl. at 293.

## V. No *Per Se* Takings Test Applies To Plaintiffs' Claim

In their brief, plaintiffs mistakenly assert that the Court should apply a *per se* takings test to their claims. App. Br. 31-32, 39-41. The Supreme Court has long distinguished between physical takings claims arising from "the government's

physical invasion or appropriation of private property," which are subject to a *per se* test, and regulatory takings claims where government regulations or statutes "unduly burden private property interests," which are generally subject to *ad hoc* consideration based on the framework set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005); *see Cedar Point Nursey v. Nassid*, 141 S. Ct. 2063, 2071-72 (2021).

But in the two most analogous cases to this one—involving legislative takings claims purportedly affecting private contract rights such as plaintiffs'—the Supreme Court has used the *Penn Central* analysis, and rejected application of any *per se* test. *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 643-44 (1993) (*Concrete Pipe*); *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224-27 (1986). Both cases involved Congress' enactment of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub. L. No. 96-364, 94 Stat. 1208, which imposed statutory liability on employers withdrawing from certain ERISA-governed pension plans.

In *Connolly*, the plaintiffs contended that Congress effected a taking by imposing withdrawal liability requiring employers to transfer their assets for private use. *Id*. at 221. The Supreme Court explained that "the fact that legislation

46

disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Id*. at 224 (citations omitted). The Court then engaged in the *Penn Central* analysis, finding that no taking occurred. Likewise, in *Concrete Pipe*, which also involved a takings claim concerning withdrawal liability, the Supreme Court expressly rejected the "contention that the appropriate framework is the one employed in . . . cases dealing with permanent physical occupation or destruction of economically beneficial use of real property." *Concrete Pipe*, 508 U.S. at 643.

And since the issuance of *Connolly* and *Concrete Pipe*, the Supreme Court has not found an alleged statutory restriction on a contractual relationship to be subject to a *per se* rule. In fact, in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Court relied on both cases to conclude that retroactive liability imposed on a former mining company under the Coal Act should be analyzed using a regulatory takings framework. *See id.* at 526-528. This Court's precedent further supports application of *Penn Central* here. For example, in *Cienega*, the Court applied the *Penn Central* factors to taking claims alleging that Congress targeted and abrogated a specific contract right. 331 F.3d at 1337-50.

Plaintiffs' contention that a *per se* test should be applied here is unavailing. Plaintiffs appear to suggest that the Supreme Court applies a *per se* test with respect to statutes altering contract rights, *see* App. Br. 32, but those cases predate

the seminal *Penn Central* decision by more than 40 years, and plaintiffs fail to explain why, if a *per se* test is required for the taking of contract rights, *Concrete Pipe*, *Connolly*, and *Cienega* all held to the contrary.  *See A & D*, 748 F.3d at 1153. Plaintiffs' reliance on *Armstrong v. United States*, 364 U.S. 40 (1960) to assert that a *per se* analysis is used "to determine that eliminating a lien to secure payment" is a taking, is likewise misplaced.  App. Br. 32.  Once again, *Armstrong* predates *Penn Central*, and in *Penn Central*, the Supreme Court cited *Armstrong* as a case where a regulatory taking occurred based on the government's frustration of investment-backed expectations.  *Penn Central*, 438 U.S. at 128.  "Thus, it is far from clear that the Supreme Court would analyze the government's destruction of liens using a framework other than the regulatory takings framework. . . ."  *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 n.7 (2d Cir. 2014); *see In re Weinstein*, 164 F.3d 677, 685 (1st Cir. 1999).  In any event, in *Armstrong* the plaintiff held a materialman's lien in building materials, a longstanding independent property right under state law.  Here, plaintiffs' security interest consisted of a contractual right to obtain funds in the future in accordance with the terms of the bond resolution, Appx73-74 (Comp. ¶¶ 14-15), and thus, given the source of the right, the takings framework for adjudicating the legislative taking of contract rights applies.  *Armstrong* also involved the complete destruction of the *value* of a lien, a circumstance that plainly does not exist here.

Finally, plaintiffs' reliance on *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 235 (2003) for the proposition that a *per se* test applies to "the transfer of money from private to public use" fails to advance their argument. App. Br. 39. In *Brown*, the Supreme Court held that takings claims involving interest generated in attorney trust accounts should be analyzed using a "*per se* approach," rather than a *Penn Central* analysis, but that determination was predicated on the fact that the interest in the trust accounts was "the 'private property' of the owner of the principal." *Brown*, 538 U.S. at 235 (citation omitted). In contrast, here any property interest in the SUT revenue fund arose from the specific contractual provisions of the bond resolution. *Penn Central* is the proper analysis here.

## VI. <u>Plaintiffs Fail To State a Cognizable Takings Claim Under *Penn Central*</u>

Even if plaintiffs have alleged sufficient Government action to bring a takings claim (they have not) and *Omnia* and its progeny do not preclude their claims (they do), plaintiffs still fail to state a claim for a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).

In *Penn Central*, the Supreme Court established three factors for assessing a regulatory taking: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action." *Taylor v.*

*United States*, 959 F.3d 1081, 1087 (Fed. Cir. 2020) (quoting *Penn Central*, 438

U.S. at 124). Plaintiffs fail to plausibly allege a taking under each factor. *See*

*Taylor*, 959 F.3d at 1088-90 (affirming RCFC 12(b)(6) dismissal where plaintiffs

fail to plausibly allege a taking under *Penn Central*).

## A.     Plaintiffs Have Not Plausibly Pleaded Sufficient Economic Impact

With respect to the first prong of *Penn Central*, plaintiffs have not plausibly

alleged that PROMESA had sufficient economic impact on any cognizable

property interest to constitute a regulatory taking. As a general matter, courts

measure economic impact by the change in fair market value of the property at

issue. *See, e.g., Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331,

1334 (Fed. Cir. 2018) ("the court must compare the value of the property

immediately before the governmental action that is alleged to cause the taking with

the value of the same property immediately after that governmental action");

*Forest Props., Inc. v. United States*, 177 F.3d. 1360, 1367 (Fed. Cir. 1999).

To start, in their complaint plaintiffs make only conclusory allegations

regarding their purported financial losses. *See e.g.*, Appx81 (Compl. ¶ 31 (alleging

that plaintiffs "lost a significant portion of the principal and interest each COFINA

Bondholder was entitled to and the fair market value of the pledged revenues, their

security interest and liens . . .")). These general allegations of economic loss fail to

satisfy basic pleading standards, which require that a plaintiff describe the loss and

its connection to the defendant's actions. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (holding complaint to be legally insufficient and observing that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind"); *A & D Auto Sales,* 748 F.3d at 1157-58.

In any event, even if the Court were to overlook plaintiffs' pleading errors, the severity of the impact would weigh strongly against finding a taking here. The Supreme Court has held "in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values," without effecting a taking. *Penn Central*, 438 U.S. at 124-25. Instead, to constitute a regulatory taking, the economic effect on a plaintiff must be sufficiently severe. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005); *Cienega*, 331 F.3d at 1340 ("What has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation."); *id* at 1345 (explaining that although there is no specific numerical threshold for economic loss, the Supreme Court has rejected takings arguments in cases where there was a 75% and 87.5% diminution in value) (citations omitted); *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (highlighting that this Court is "aware of no case in which a court has found a taking where diminution in fair market value was less than 50%").

Plaintiffs cannot plausibly demonstrate sufficiently severe economic impact under *Penn Central*. As a preliminary matter, plaintiffs contend that the taking of their property occurred with the enactment of PROMESA, Appx81, but they make no allegation of economic loss related to the congressional enactment and no attempt to compare the value of the property immediately before the government action with the value of the same property immediately after that action. *See Love Terminal Partners*, 889 F.3d at 1343. In addition, even if the Court were to evaluate the economic impact of PROMESA's purported application to plaintiffs' bonds, at the most basic level, plaintiffs have not alleged that PROMESA's application severely impacted the value of their property, nor can they make such an allegation. The confirmation plan for COFINA provided that plaintiffs would receive fifty-five cents on the dollar compared to the par value of their COFINA bonds. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 361 F.Supp.3d, 203, 243-244 (D. P.R. 2019).[9] And the district court determined that this was insufficient for similarly situated junior bondholders to demonstrate a regulatory taking under the economic impact prong of *Penn Central*. *See id*. Accordingly, plaintiffs cannot establish sufficiently "severe" economic impact to constitute a

---

[9] It is highly doubtful that the fair market value of a COFINA junior bond would actually equate to the par value of the bond immediately prior to PROMESA's enactment given the severe economic uncertainty surrounding the Commonwealth at that time.

regulatory taking, and this prong weighs heavily against finding a taking. *See Concrete Pipe*, 508 U.S. at 645.

## B. PROMESA Has Not Plausibly Interfered With Plaintiffs' Reasonable Investment-Backed Expectations

Plaintiffs have also not plausibly established that the reasonable-investment backed expectations prong of *Penn Central* weighs in favor of a taking. To begin, plaintiffs fail to provide any non-speculative basis to evaluate their investment-backed expectations because they fail to allege *when* they purchased the bonds at issue. *See Taylor*, 959 F.3d at 1088-90 (analyzing investment-backed expectations based on the date property was acquired).

In any event, the reasonable investment-backed expectations prong still does not plausibly weigh in favor of a taking. "It is axiomatic that 'a reasonable investment-backed expectation' must be more than 'a unilateral expectation or an abstract need.'" *Norman v. United States*, 429 F.3d 1081, 1092 (Fed. Cir. 2005) (quoting *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1005-06 (1984)). In determining whether a property owner has established reasonable investment-backed expectations, this Court has identified three considerations: (a) "whether the plaintiff operated in a 'highly regulated industry'"; (b) "whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property"; and (c) "whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory

environment' at the time of purchase." *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (*en banc*)).

Here, in their complaint, plaintiffs appear to base their investment-backed expectations on allegations that they expected the COFINA bonds would never be affected by a congressional restructuring statute such as PROMESA because (1) at the time Congress passed PROMESA, Puerto Rico could not file for bankruptcy under Chapter 9; (2) PROMESA's provisions are different from those in Chapter 9, and could not be anticipated; and (3) the Commonwealth had by legislative act pledged a portion of the SUT revenues to be out of the reach of the Commonwealth's general obligations. *See* Appx72-78 (Compl. ¶¶ 11-25, 34); App. Br. 42. Under the *Appolo* factors, plaintiffs fail to plausibly allege reasonable investment-backed expectations.

With respect to the first factor—the highly regulated nature of the industry— there can be no reasonable dispute that plaintiffs voluntarily entered into the highly regulated municipal bond market. *See, e.g., Moholt v. Dean Witter Reynolds, Inc.*, 478 F. Supp. 451, 453 (D. D.C. 1979) (securities field is highly regulated). It is well established that those operating in regulated fields cannot assert a taking when Congress amends the law to address gaps in the legislative scheme. *See Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 226-27 (1986) (no taking when

Congress enacted pension law imposing withdrawal liability on employers as amendment to ERISA requirements). Under the second factor, Puerto Rico's financial situation, which subsequently necessitated congressional action through PROMESA, was widely known. Indeed, plaintiffs' own allegations establish that even prior to the issuance of the COFINA bonds, Puerto Rico was in an economic crisis, and that it had subsequently attempted to create its own bankruptcy-like structure to address the situation. *See* Appx72-75 (Compl. ¶¶ 11-19).

With respect to the third factor—whether regulation could have been reasonably anticipated based on the regime at the time—a key consideration is whether in the relevant regulatory environment it would be expected that the law might change. *See Cienega Gardens v. United States*, 503 F.3d 1266, 1288 (Fed. Cir. 2007) (citation omitted). "[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations . . . even though the effect of the legislation is to impose a new duty or liability based on past acts." *Concrete Pipe*, 508 U.S. at 646 (holding that plaintiff lacked a reasonable investment-backed expectation that ERISA's original limitations would not be adjusted) (citation omitted).

Plaintiffs purchased bonds supported by SUT revenues flowing from a territory whose fiscal situation was precarious even when the initial COFINA bonds were issued in 2009. *See Altair II*, 151 Fed. Cl. at 296. As the Court in

*Altair II* explained, *id.*, the "risk of a potential bankruptcy was in fact foreseen in 2008." Plaintiffs' suggestion that Puerto Rico would never be subject to bankruptcy protection is therefore not persuasive on its face. Indeed, plaintiffs can hardly claim to have had a reasonable investment-backed expectation that Puerto Rico municipalities would never be subject to the same provisions of the Bankruptcy Code that apply to municipalities throughout the United States. "No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit." *New York Cent. R.R. v. White,* 243 U.S. 188, 198 (1917); *see Branch v. United States,* 69 F.3d 1571, 1577-78 (Fed. Cir. 1995).

Although plaintiffs are correct, Appx74 (Compl. ¶ 17), *see* App. Br. 42, that Congress in 1984 had amended the Bankruptcy Code to change the definition of a "State" to exclude Puerto Rico for purposes of who may be a Chapter 9 debtor, that change only cemented the fact that Congress might later change its mind as to whether Puerto Rico would be able to file for bankruptcy protection as Puerto Rico remained subject to the Code's definition of a State for all other purposes. *See* 11 U.S.C. § 101(52); *see Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 121 (2016). Similarly, plaintiffs' allegation that Puerto Rico attempted to pass its own bankruptcy law which was later struck down by the Supreme Court, Appx75 (Compl. ¶¶ 18-19), only demonstrates that there would likely be further attempts to address the economic crisis, including by Congress. Here, plaintiffs

were operating in a regulatory arena over which the Constitution gives Congress the express power to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4, and specifically, as pertains to municipal bankruptcy, where Congress had preempted the field since 1946. *See Franklin*, 579 U.S. at 121. And they were operating in a regulatory environment in which Congress had plenary power to make rules and regulations concerning the Commonwealth as a territory.

Absent a reasonable investment-backed expectation that Puerto Rico and its instrumentalities would never again be subject to Federal municipal bankruptcy law, plaintiffs cannot establish any reasonable investment-backed expectations here. *See Commonwealth Edison*, 271 F.3d at 1348-57 (ruling by *en banc* Federal Circuit affirming dismissal of takings claim because existing legal regime revealed a lack of reasonable expectations).

Moreover, as previously stated, plaintiffs' allegations, *see* Appx78-80 (Compl. ¶¶ 24-28), that PROMESA treats plaintiffs' alleged secured interests differently than under a Chapter 9 municipal bankruptcy, fails to advance their position. Plaintiffs' contentions are divorced from PROMESA's direct incorporation of numerous provisions of the Bankruptcy Code. *See* 48 U.S.C. § 2161(a). Similarly, plaintiffs fail to point to anything about PROMESA's automatic stay provision that would differentiate it from an automatic stay in a

municipal bankruptcy under Chapter 9.  *See* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 362's automatic stay provisions).  Accordingly, plaintiffs' allegations concerning their investment-backed expectations primarily hinge on the contention that Congress would not re-extend Chapter 9 protection to Puerto Rico, which was not a reasonable assumption.

Finally, plaintiffs' allegation that COFINA's creation and the pledging of the SUT revenues created a reasonable expectation that the revenues would never be subject to competing claims by the Commonwealth, *see* Appx72-73, Appx82 (Compl. ¶¶ 11-14, 34), is undermined by the official bond statements issued with the securities.  For example, the statement issued with the First Subordinate Series 2009A bonds explained that "[t]o the extent that a court determines that the Pledged Sales Tax constitutes 'available resources' for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds . . . .").[10]  That public statement clearly puts any bond purchasers on notice that there would likely

---

[10] Official Statement, Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A, at 32 (June 10, 2009), available at https://www.aafaf.pr.gov/wp-content/uploads/ISSUERS/COFINA/Subordinate-Bonds/2009/Sales-Tax-Revenue-Bonds-First-Subordinate-Series-2009-A.pdf (last visited December 15, 2022).

be competing claims to the SUT revenues that would need to be settled in court—

exactly the situation that occurred in COFINA's restructuring.

### C. The Character Of The Government Action Supports That No Taking Occurred

The final *Penn Central* factor, the "character of the government action," also

weighs strongly against finding a taking here.  Contrary to plaintiffs' contentions,

with PROMESA's enactment, "the Government [did] not physically invade or

permanently appropriate any of the [bondholder's] assets for its own use."

*Connolly*, 475 U.S. at 225.  Any interference with the bondholder's purported

property rights "arises from a public program that adjusts the benefits and burdens

of economic life to promote the common good and, under [the Supreme Court's]

cases, does not constitute a taking requiring Government compensation."  *Id.* at

225.  Here, in enacting PROMESA, Congress was addressing the drastic economic

crisis faced by the Commonwealth.  *See Centro de Periodismo*, 598 U.S. at 342.

Moreover, as set forth above, plaintiffs have neither plausibly alleged sufficient

government action for a taking given that PROMESA simply provided a

generalized framework for restructuring territorial debt, and because plaintiffs have

not plausibly alleged that Congress "targeted" plaintiffs' property through

PROMESA.  Plaintiffs fail to identify any case where takings liability has attached

based on Congress implementing a general statutory framework.  *See Taylor*, 959

F.3d at 1089-90 (finding the character of government action prong weighs in favor

of no taking where the alleged actions fall "into no category of government action" the Court has recognized as supporting a regulatory taking).

Accordingly, because each *Penn Central* factor weighs against plaintiffs, no taking occurred here.

## VII. The Trial Court Did Not Abuse Its Discretion In Denying Plaintiffs Leave to Amend Their Complaint

Finally, contrary to plaintiffs' argument, App. Br. 43-44, the trial court did not abuse its discretion in denying plaintiffs' boilerplate request to amend their complaint contained in their opposition to the Government's motion to dismiss.

Although RCFC 15(a)(2) provides the trial court with discretion to grant a request for leave to amend a complaint "when justice so requires," such a request should be denied where the amendment would be futile. *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1333 (Fed. Cir. 2000); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). An amendment is futile if it would not survive an RCFC 12(b)(6) motion to dismiss. *See, e.g., Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006). It is well-established that to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

As set forth above, the trial court lacked jurisdiction and plaintiffs cannot show sufficient Government action to state a cognizable takings claim. *See* Sections II-III. Before the trial court and in their opening brief, plaintiffs have failed to identify any additional factual allegations that could resuscitate their claim. Accordingly, the trial court did not abuse its discretion in denying plaintiffs' perfunctory request to amend.

## CONCLUSION

For these reasons, the Court should affirm the trial court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Nathanael B. Yale
NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:(202) 616-0464


December 20, 2023                    *Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, Defendant-Appellee's counsel certifies that this Brief complies with the Court's type-volume limitation rules. This Brief was printed in Times New Roman font at 14 points. According to the word-count calculated by Microsoft Word, this brief contains a total of 13,543 words, which is within the 14,000 word limit.


<u>/s/ Nathanael B. Yale</u>
NATHANAEL B. YALE